1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DOUGLAS ERWIN,

11          Petitioner,              2: 10 - cv - 2568 - FCD TJB

12      vs.

13   ANTHONY HEDGPETH,

14          Respondent.          <u>ORDER, FINDINGS AND</u>

15                            <u>RECOMMENDATIONS</u>

16   _____/

17          Petitioner, Douglas Wayne Erwin, is a state prisoner proceeding with a *pro se* petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a determinate

19   sentence of twenty-two years in prison after pleading guilty to committing robbery with an

20   enhancement for the intentional discharge of a firearm.  Petitioner raises five claims in this

21   federal habeas petition; specifically: (1) That his guilty plea was involuntary as a result of the

22   ineffective assistance of his counsel ("Claim I"); (2) that his counsel was ineffective for failing to

23   conduct a reasonable pretrial investigation ("Claim II"); (3) that his plea was the product of

24   outrageous government misconduct in that the lead detective falsified reports and evidence

25   ("Claim III"); (4) that his counsel was ineffective at sentencing for failing to object to the

26   prosecution's evidence and for failing to inform him of his right to appeal; and, (5) that evidence

1

used to convict him was obtained through an illegal search in violation of his Fourth Amendment

rights.  For the reasons stated herein, the federal habeas petition should be denied.

## I.  FACTUAL BACKGROUND

1.  State Court Decision[1]

The following facts were revealed at defendant's . . . trial:[2]

> F.W. was sitting in her car outside a Circle K in Elk Grove in the early morning hours of July 26, 2005. She worked at the store, but was off-duty at the time. F.W. allowed a short Black man to use her lighter then asked the man if he knew anyone who wanted to buy a bag of marijuana. She gave him her name and phone number. The man returned approximately 10 or 15 minutes later, and demanded her purse at gunpoint. A struggle ensued. A taller, light-skinned man arrived on the scene and told F.W. to open the passenger door. Eventually the taller man pulled the purse from F.W.'s hands. F.W. ran after the two men, yelling, "[Y]ou're not getting nothing" or "[Y]ou all ain't nothing but bitches. . . ." The short man shot F .W. in the groin and thigh, and ran away. The crime scene investigator found a .22-caliber shell casing at the scene of the shooting.

2.  Further Pertinent Facts and Procedural History

Later, on the day of the shooting, police obtained from the manager of the Circle K a

compact disc which included the store's video surveillance from the incident.  Pet'r's First Am.

Pet. (Hereinafter "Pet."),  Ex. 48.  A detective brought the video to the hospital, where he showed

the video to the victim.  The victim identified a person in a yellowish shirt who had purchased

cigarettes inside the store prior to the robbery as the person who later, along with another man,

attempted to rob her.  *Id.*; Rep.'s Tr. at 241, 248.  The victim identified the man in the yellowish

shirt as the one who shot her.  Pet., Ex. 48.  The detective then isolated several images of the

---

[1]     The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from March 2008 and filed in this Court by Respondent on December 23, 2010 as Exhibit 1 to his answer (hereinafter referred to as the "Slip Op.").

[2]     Defendant's trial ended in a mistrial when the video surveillance from the Circle K, which had previously been misplaced by the prosecution, was rediscovered.  *See infra*.

1    suspect, *id.*, and created a crime bulletin from those images.  Pet., Ex. 44.  The surveillance

2    video was thereafter lost by the prosecution, *see* Clerk's Tr.at 138, not to be seen by the District

3    Attorney prosecuting the case nor Petitioner or his co-defendant's counsel until it was

4    rediscovered contemporaneously with the victim's testimony at Petitioner's trial.  Rep.'s Tr. at

5    230-31.  The images taken from the video and placed in the crime bulletin, as well as other

6    detective work by the Sacramento Sheriff's Department, helped identify Petitioner as the suspect

7    seen purchasing cigarettes in the video, though the victim could not identify Petitioner out of a

8    photo lineup.  *See* Clerk's Tr. (Preliminary Hearing) at 53-58, 66-67.  Eventually, Petitioner was

9    arrested and was scheduled for trial along with his co-defendant, Kenneth Lomack, in early 2007.

10    Prior to trial, Petitioner's counsel recommended Petitioner accept a plea agreement

11    offered by the prosecution and plead guilty to some of the crimes charged in exchange for a

12    twenty-two year prison term.  *See* Pet., Ex. 4.  Under the agreement, Petitioner would plead

13    guilty to the robbery charge and to an enhancement for the intentional discharge of a firearm in

14    the commission of a felony.  *See* Cal. Penal Code § 12022.53(c); Rep.'s Tr. at 337-38.  If

15    Petitioner was found guilty of the charged enhancement, discharge of a firearm causing great

16    bodily injury, he would face a mandatory term of twenty-five years to life in prison.  *See* Cal.

17    Penal Code § 12022.53(d).  At this point, Petitioner refused the proposed plea agreement and

18    decided, against the advice of his attorney, to proceed to trial.

19    During the Court's consideration of the Petitioner's pre-trial motions, the Petitioner

20    expressed dissatisfaction with his representation, and moved to have his counsel removed.[3]

21    Rep.'s Tr. at 30.  After a hearing on the motion, it was denied.  Clerk's Tr. at 127.

22    / / /

23    / / /

24    _____

25    [3]    The transcript of the hearing on the motion was sealed and has not been provided
to this court.  *See* Rep.'s Tr. at 31-36 (omitted pages).  It is not necessary to view the transcript to

26    determine the merits of Petitioner's claims.

1    Petitioner's counsel continued to argue various motions on behalf of Petitioner, including

2    a motion to suppress several of Petitioner's statements to investigators as violations of

3    Petitioner's *Miranda* rights.  *See* Rep.'s Tr. at 67-77.  Furthermore, Petitioner's counsel joined in

4    a motion with Petitioner's co-defendant's counsel, pursuant to *California v. Trombetta*, 467 U.S.

5    479 (1984), to have the case dismissed due to the prosecution's loss of the surveillance video,

6    which the defense claimed may contain exculpatory evidence.  *See* Rep.'s Tr. at 62.  The court,

7    concluding that the defense could not show that the video contained any exculpatory evidence or

8    that the video was lost in bad faith, denied Petitioner and his co-defendants *Trombetta* motion.

9    *Id.* at 64-66.  Lastly, discussed more fully below, Petitioner made a motion to suppress evidence

10   that was discovered in a search of an apartment.  *Id.* at 85.

11   At Petitioner's trial, the victim was called as the prosecution's first witness and she

12   testified as to the events of the early morning hours of July 26, 2005.  *Id.* at 193.  The victim was

13   sitting in her car outside the Circle K waiting for the attendant, her friend and co-worker, to come

14   outside and smoke a cigarette with her.  She observed a black male wearing a yellowish, bright

15   colored shirt and pajama type pants purchase something inside the Circle K.  *Id.* at 204.  When

16   the man came out of the Circle K, he borrowed a lighter from the victim.  She offered to sell him

17   some marijuana.  The man said that he did not need any, but obtained the her phone number in

18   case his friend wanted to purchase some later.  *Id.* at 205.  Minutes later, the man returned to the

19   Circle K, put a gun in the victim's face, and demanded her purse.  *Id.* at 212-213.  A struggle

20   ensued and eventually the man and his accomplice began to walk away with the victim's purse.

21   She began yelling at the men and the man in the yellowish shirt, who had previously held a gun

22   up to the victim, shot her.  *Id.* at 221.  She further testified that, later, at the hospital, she was

23   shown the surveillance tape from the Circle K and she identified a man wearing a yellowish shirt,

24   shown at the counter purchasing cigarettes, as the man who robbed and shot her.  *Id.* at 241.

25   / / /

26   / / /

4

1      The victim's testimony occurred over two days of trial.  The morning of the second day

2the court noted that the surveillance video tape had been found somewhere in the prosecution's

3files.  *Id.* at 229-30.  Both Petitioner and his co-defendant moved for a mistrial, *id.* at 230-31,

4which the court granted after the conclusion of the victim's testimony and hearing additional

5argument on the motion.  *Id.* at 316-17.  Petitioner was scheduled to be retried later the same

6week the mistrial was granted.

7      Prior to retrial, Petitioner's counsel again urged him to accept the proposed plea

8agreement, believing that it was Petitioner's only possibility of avoiding a life sentence.  In a

9letter to the Presiding Judge of the Superior Court,[4] Petitioner's mother recalled the moments

10before Petitioner ultimately decided to plead guilty.  Pet., Ex. 21.  Counsel, urging Petitioner's

11mother to tell Petitioner to accept the plea agreement, "yelled" to Petitioner's mother: "do you

12want your son to do life?" *Id.*; *see also* Clerk's Supp. Tr. (Notice of Appeal) at 2.  Just before

13Petitioner's retrial was to begin, Petitioner agreed to plead guilty in exchange for the twenty-two

14year determinate sentence.  Rep.'s Tr. at 337.  The court went through a lengthy plea colloquy, in

15which Petitioner stated that he was aware of the nature of the crimes he was charged with; had

16sufficient time to speak with his lawyer about the charges, the consequences of the plea, and any

17legal defenses he may have; that he understood he faced a maximum sentence of life in prison

18under the charges but would receive a twenty-two year sentence based on the plea agreement; and

19that he was entering the plea freely and voluntarily after fully discussing the case with his

20attorney.  *Id.* at 338-45.  The court found a factual basis for the plea and that Petitioner had

21entered the plea knowingly, intelligently, and voluntarily.  *Id.* at 345.  At a later date, Petitioner

22was sentenced to twenty-two years in prison pursuant to the plea agreement.  *Id.* at 357.

23*/ / /*

24

25    [4]     Petitioner's mother, Rhonda Erwin sent letters to the California Bar, the American

26Bar Association, and the Presiding Judge of the Superior Court, all seeking help in removing
Petitioner's counsel.  *See* Pet., Ex. 4-9.  They responded that they were powerless to act.

II.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  *See* 28 U.S.C. 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher

threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is clear, however, that the state court has not decided an issue, we review that question *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S. 374, 377 (2005).

### III.  ANALYSIS OF PETITIONER'S CLAIMS

1.  Claim I

In Claim I, Petitioner alleges that his guilty plea was not voluntary and intelligent because the advice he received from counsel with regard to the guilty plea fell below the requisite standard of care.  Petitioner did not raise this claim in his direct appeal to the California Court of Appeal.  He did, however, raise the claim before the California Supreme Court through a petition for habeas corpus, which was summarily denied.  *See* Lodged Doc. No. 11 (Petition for Writ of Habeas Corpus Filed With California Supreme Court) at 3; Lodged Doc. No. 12 (California Supreme Court Order Summarily Denying Petition for Writ of Habeas Corpus).

"The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citations and internal quotation marks omitted).  A defendant who has plead guilty upon the advice of counsel "may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not with the standards set forth in *McMann* [*v. Richardson*, 397 U.S. 759 (1970)]." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973).  That is, that counsel's advice was not "within the range of competence demanded of attorneys in criminal cases." *McMann*, 397 U.S. at 771.

The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective assistance of counsel.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.* at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

7

1  of reasonable professional judgment. *See id.* at 690.  The federal court must then determine

2  whether in light of all the circumstances, the identified acts or omissions were outside the range

3  of professional competent assistance. *See id.*

4        Second, a petitioner must affirmatively prove prejudice. *See id.* at 693.  Prejudice is

5  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

6  result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a

7  probability sufficient to undermine the confidence in the outcome." *Id.*  A reviewing court "need

8  not determine whether counsel's performance was deficient before examining the prejudice

9  suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

10  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

11  followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at

12  697).

13        The Supreme Court has held that the *Strickland* standard applies where a petitioner

14  challenges the effectiveness of his counsel with regard to a plea of guilty.  *Hill*, 474 U.S. at 58.

15  "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a

16  reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

17  have insisted on going to trial." *Id.* at 59 (footnote omitted).  "For example, where the alleged

18  error of counsel is a failure to investigate or discover potentially exculpatory evidence, the

19  determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather

20  than go to trail will depend on the likelihood that discovery of the evidence would have led

21  counsel to change his recommendation as to the plea.  This assessment, in turn, will depend in

22  large part on a prediction whether the evidence likely would have changed the outcome of the

23  trial." *Id.*

24        A summary denial by a state court represents a decision on the merits for purposes of

25  AEDPA. *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011)

26  (holding that 28 U.S.C. § 2254(d) "does not require a state court to give reasons before its

8

1   decision can be deemed to have been 'adjudicated on the merits.'").  When analyzing a claim for

2   ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas

3   court's ability to grant the writ is limited by two "highly deferential" standards.  *Premo v. Moore*,

4   __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011).  "When § 2254(d) applies," as it does

5   here, "the question is not whether counsel's actions were reasonable.  The question is whether

6   there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

7          Many of Petitioner's factual allegations in Claim I do not relate to any advice that was

8   given to Petitioner with regard to his plea, but rather with events which occurred during

9   Petitioner's trial, which ended in a mistrial.  For instance, Petitioner alleges that his counsel

10  failed to provide him with an unbiased jury by permitting a probation officer who was a member

11  of the jury pool to state he knew Petitioner.  However, the record indicates that the entire jury

12  panel was stricken after this statement.  *See* Rep.'s Tr. at 166; Clerk's Tr. at 150.  Therefore

13  Petitioner cannot show that he was in any way prejudiced by such a statement.   Furthermore,

14  Petitioner alleges that his "case was prejudiced as his attorney sat him directly facing the jury

15  members as a large projector screen (also facing the jurors) showed photos that prejudiced the

16  case" and that his counsel failed to object to the introduction of prejudicial photos shown at trial.

17  Again, this is a reference to Petitioner's trial, which ended in a mistrial before Petitioner decided

18  to accept the plea agreement.  As such, Petitioner cannot show that he was prejudiced by such

19  activity.

20          Counsel repeatedly suggested Petitioner accept a plea agreement which had been offered

21  by the prosecution.  Initially Petitioner refused.  As time passed, Petitioner became dissatisfied

22  with counsel's representation.  Before Petitioner's trial, he made a motion pursuant to *People v.*

23  *Marsden*, 2 Cal.3d 118, 465 P.2d 44, 84 Cal.Rptr. 156 (1970), to have his counsel replaced.  The

24  motion was denied.  Clerk's Tr. at 127.  Dissatisfaction with one's counsel, however, even on

25  direct review, is not sufficient to warrant relief for ineffective assistance of counsel.  Petitioner

26  must show that his attorney's conduct fell below an objective standard of reasonableness which

9

1  resulted in prejudice to his defense. *Strickland*, 466 U.S. at 688.

2        Petitioner claims his counsel should have done further investigation regarding

3  fingerprints on the gun involved in the shooting and done more to question the lead detective's

4  credibility.  Petitioner further alleges that the photographic and video evidence were altered to

5  change the color of the suspect's shirt and that counsel should have obtained expert testimony in

6  support of such allegation.  Considering the strength of the evidence against Petitioner, it is

7  unlikely that had counsel done as Petitioner suggests that any exculpatory evidence would have

8  been found, or that such evidence would have been enough to change counsel's opinion in

9  suggesting Petitioner plead guilty. *See Hill*, 474 U.S. at 59.

10        A review of the entire record shows Petitioner's counsel thought Petitioner had a weak

11  defense and that the prosecution's case would likely be successful. *See, e.g.*, Rep.'s Tr. at 39.  At

12  Petitioner's  trial, when only pictures were available to corroborate the victim's testimony and

13  place Petitioner at the scene of the crime, Petitioner's counsel attempted to create an identity

14  defense.  Petitioner's counsel argued that the prosecution could not prove beyond a reasonable

15  doubt that the person pictured buying cigarettes at the counter inside the store, which counsel

16  admitted was Petitioner,[5] was the same person who spoke with the victim outside the store about

17  purchasing some marijuana and later returned to rob and shoot her. *See* Rep.'s Tr. at 306.  Once

18  the videotape of the surveillance cameras at the scene resurfaced, an identity defense became a

19  much more difficult proposition. The video showed the same person identified as Petitioner at

20  the counter buying cigarettes go outside and converse with the victim.  Minutes later, that same

21  person came back to the store, where what appears to be an altercation with the victim ensued.

22  The video thus corroborated the victim's testimony.  As the trial judge stated in granting

23  Petitioner and his co-defendant's motion for a mistrial, "the evidence is much stronger in the

24  _____

25        [5]        While a transcript of the interview is absent from the record, the Detective
   investigating the case claims that Petitioner, after being informed of his rights pursuant to
26  *Miranda*, admitted he was the person purchasing cigarettes in the photo.  Clerk's Tr. at 61; *id.* at
   182 (Petitioner's counsel admitting Petitioner made such a statement).

video than it was with the still photography;" "the strength of [the prosecution's] case considerably improves with the introduction of the videotape;" and, Petitioner's counsel had "correctly stated that the evidence on the tape arguably is more inculpatory than had previously been suggested by the still photography."  Rep.'s Tr. at 308, 311, 316.  As Counsel stated:

> In my opening statement, I informed the jury, yes, Mr. Erwin was in the store that night, he purchased cigarettes, but he's not the robber.  Yes, [the victim] was robbed; yes, she was shot, but not by my client. . . .
>
> Now having looked at the video, the person who had contact with [the victim], after having purchased the cigarettes, is my client, and I'm saying that because the video shows an individual inside the store who I have conceded to the jury is my client, and shortly thereafter he leaves the store.  And then a person in a yellow shirt is seen moving around and arguably having a confrontation with [the victim] at her vehicle. . . .

*Id.* at 307.  Before Petitioner's retrial began, Counsel again urged Petitioner to accept the plea agreement.  She also urged Petitioner's mother to encourage him to accept the plea agreement, stating that it was the only way for him to avoid life in prison.

"Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, and counsel is not required to investigate every possible line of defense, *Id.* at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").  Here, based on the strength of the evidence against Petitioner[6]—the surveillance video and the victim's testimony—Petitioner's counsel could reasonably have concluded that any additional investigation was unnecessary and a plea

---

[6]      The strength of the evidence would also make it difficult for Petitioner to affirmatively show Prejudice under the second prong of *Strickland*: that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see Strickland*, 466 U.S. at 692.  Petitioner insisted on going to trial, even with the alleged deficiencies of his counsel.  It was only when the surveillance footage was rediscovered that Petitioner chose to plead guilty, making this the more likely cause of his plea.

1   agreement was in Petitioner's best interest to avoid what counsel reasonably believed was an

2   impending life sentence.  *See Hill*, 474 U.S. at 59.  Applying AEDPA's highly deferential

3   standard, a reasonable argument exists that counsel satisfied *Strickland*'s deferential standard.

4   *See Premo*, 131 S.Ct. at 740.  As such, Petitioner cannot show that his plea was a result of

5   ineffective assistance of counsel and, therefore, Petitioner is not entitled to relief on Claim I.

6       2.  Claims II and III

7       Claims II and III raise issues with regard to pre-plea conduct.  Specifically, in Claim II,

8   Petitioner contends that his counsel was ineffective because counsel failed to conduct a

9   reasonable pre-trial investigation.  In Claim III, Petitioner alleges outrageous government

10  misconduct, arguing that one of the lead detectives in the case not only misrepresented the facts

11  but actually wrote false reports and altered physical evidence in order to implicate Petitioner in

12  the crime.

13      "A plea of guilty and the ensuing conviction comprehend all of the factual and legal

14  elements necessary to sustain a binding, final judgment of guilt and a lawful sentence.

15  Accordingly, when the judgment of conviction upon a guilty plea has become final and the

16  offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the

17  underlying plea was both counseled and voluntary. If the answer is in the affirmative then the

18  conviction and the plea, as a general rule, foreclose the collateral attack."  *United States v. Broce*,

19  488 U.S. 563, 569 (1989).  "[A] guilty plea represents a break in the chain of events which

20  preceded it in the criminal process.  When a criminal defendant has solemnly admitted in open

21  court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise

22  independent claims relating to the deprivation of constitutional rights that occurred prior to the

23  entry of the guilty plea."  *Tollet*, 411 U.S. at 267 (1973); *see Hudson v. Moran*, 760 F.2d 1027,

24  1029-30 (9th Cir. 1985), *cert. denied*, 474 U.S. 981 (1985) (" As a general rule, one who

25  voluntarily and intelligently pleads guilty to a criminal charge may not subsequently seek federal

26  habeas corpus relief on the basis of pre-plea constitutional violations."); *Moran v. Godinez*, 57

1   F.3d 690, 699-700 (9th Cir. 1994), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S.

2   63 (2003) (applying *Tollett* to bar inquiry into the merits of a Petitioner's pre-plea ineffective

3   assistance of counsel claim).

4       As Petitioner's plea was both counseled and voluntary, *see* Claim I, *supra*, Petitioner is

5   barred from raising any alleged constitutional violations which arose before his plea of guilty.

6   As such, Claims II and III are barred and Petitioner is not entitled to relief on these Claims.

7       3.  Claim IV

8       In Claim IV, Petitioner alleges his trial counsel was ineffective at Petitioner's sentencing.

9   Specifically, Petitioner alleges: 1) his counsel was deficient in failing to object to Petitioner's

10  probation report, which he asserts contained false information; 2) counsel failed to inform

11  Petitioner of the details of the sentencing procedure; and, 3) counsel failed to inform Petitioner of

12  his right to appeal.

13      Pursuant to *Strickland v. Washington*, discussed more fully *supra*, in order for a Petitioner

14  to succeed on a claim of ineffective assistance of counsel he must show that counsel's

15  performance fell below an objective standard of reasonableness and that he was actually

16  prejudiced by counsel's substandard performance.  *Strickland*, 466 U.S. at 687.  Petitioner cannot

17  affirmatively show that "there is a reasonable probability that, but for counsel's unprofessional

18  errors, the result of the proceeding would have been different." *Id.* at 694.  Petitioner, facing the

19  possibility of a life sentence if found guilty at trial, plead guilty to the charged crimes in

20  exchange for a determinate sentence of twenty-two years in prison.  *See* Rep.'s Tr. at 337-345.

21  Even assuming the information provided in the pre-sentence report was factually incorrect or that

22  counsel failed to inform Petitioner of the detailed sentencing procedures, this had no bearing

23  upon the imposed twenty-two year sentence as this had already been agreed upon when Petitioner

24  plead guilty.[7]  Furthermore, Petitioner cannot show prejudice with regard to counsel's alleged

25

26      [7]      The pre-sentence probation report recommended a term of twenty-*three* years.
        Rep.'s Tr. at 355.  The court rejected this recommendation and stood by the stipulated agreement,

1   failure to inform him of his ability to appeal because Petitioner did, in fact, timely appeal his

2   case.  *See* Slip Op.  As such, Petitioner cannot affirmatively prove he was prejudiced by

3   counsel's alleged ineffectiveness at sentencing and, therefore, Petitioner is not entitled to relief

4   on Claim IV.

5       4.  Claim V

6       In Claim V, Petitioner alleges that evidence used to convict him was obtained through an

7   illegal search of an apartment at which he was an overnight guest in violation of his Fourth

8   Amendment rights.  After holding an evidentiary hearing on Petitioner's motion to suppress, the

9   trial court concluded that the search of the apartment was constitutional and denied the motion.

10  Rep.'s Tr. at 137.  On appeal, the California Court of Appeal found as follows:

> Before trial, the following evidence was introduced at the hearing
> on defendant's motion to suppress:
>
> At approximately 7:00 p.m. on the evening of July 28, 2005,
> Sacramento Police Officer Zachary Bales was on duty at the
> Evergreen Shopping Center with his partner Officer Shrum. Bales
> heard at least three gunshots fired from the direction of apartments
> across the street. The two officers received a radio dispatch
> regarding the gunshots at the same time they started driving to the
> apartments. They advised dispatch that they were responding and
> asked for back-up units. A copy of the dispatch appeared on Bales's
> computer which indicated that the caller described the suspects as a
> group of five 17-year-old Hispanic males in a black and gray SUV.
> Given the "computer lag time," Bales was unsure whether he read
> all the details at the same time that he received the radio dispatch.
>
> Mr. Shekh, the security guard at the apartment complex, hailed
> Bales and Shrum when they drove through the gates. Bales testified
> that he asked Shekh "if he had heard where the shots had come
> from" and Shekh responded, "[Y]es, they had run into [apartment]
> 128." Bales did not ask for details about the physical description of
> the men that Shekh had seen. Shekh directed the officer to
> apartment 128. Officer Schrum observed a gray Suburban parked
> nearby.
>
> Officer Bales noticed children playing in the area and decided to
> contact the occupants of unit 128 immediately "for the safety of all
> the individuals" at the apartments. The officers smelled a strong

26  a term of twenty-two years in prison.  *Id.*

odor of marijuana when they came within 10 feet of the door. Bales knocked, loudly announcing, "Sacramento Police Department ... open the door." After about five minutes, a man named Kenneth Carter came to the door and opened it slightly. When he saw Bales, he "raised his hands, opened the door further, and swung his hand backward motioning [Bales] to come in."

Upon entering the apartment, Bales called for everyone to come out with their hands up. Defendant, his co-defendant and a third man responded by walking out of the apartment. Officer Bales testified that, "all of the subjects stated that they did not live there. They all stated they were on probation."

Bales and two officers conducted a protective sweep of the apartment while other officers detained the four suspects outside. Bales explained: "There was shots fired in the immediate time frame and [they] had a witness tell [them] that he saw those individuals run into that area. A vehicle matching the description was right there and several subjects came out of the apartment." During the protective sweep, Bales observed pieces of torn plastic on the floor which looked like narcotics packaging. He also found a plastic bag that contained live ammunition in the back bedroom.

At some point, Officer Shrum informed Bales that the apartment was rented by a woman named Maleka Williams. Officer Bales attempted to contact Williams after he carried out the protective sweep to obtain her permission to conduct a more extensive search of the apartment. However, he was unable to obtain a phone number other than the number for the apartment.

Based on the suspects' stated probation status, Bales decided to conduct a probation search of the areas under their immediate control. Because there were no locked doors, and the suspects came from the back hallway, the officers searched the entire apartment. They found a .22-caliber revolver in the area between the kitchen and living room. Bales searched what appeared to be the master bedroom and found another handgun and a rifle partly concealed behind the dresser.

Officer Bales contacted Mr. Shekh a second time after the search was over. Bales acknowledged that there was a significant language barrier in conversing with him. This time, Shekh told Bales that he had not heard any gunshots at all.

Defendant moved to suppress evidence collected in the search of apartment 128. Defendant represented in the statement of facts included in his points and authorities that "Officers questioned the men and learned that they were all on *searchable* probation, and that none of them lived [at the apartment]." (Italics added.) In addition, defendant filed an unsworn declaration in which he described his relationship to Maleka Williams, the tenant in

apartment 128. Among other things, defendant stated in the declaration that he had "permission on July 28 to stay with Ms. Williams at her apartment until [his] mother could get enough money together to get [him] out of state to stay with a relative for a while." Defendant had spent the night at Williams's apartment in the past and "was free to come and go, ... to use the facilities ... and keep some possessions there such as necessary clothing and toiletries." The declaration went on to say, "On the afternoon of July 28, I expected privacy inside Ms. Williams' apartment. It was 'my house' at that time as far as I was concerned ."

The court denied defendant's motion to suppress the evidence collected at Williams's apartment. First, the court found that as an overnight guest, defendant had a reasonable expectation of privacy in the apartment, including the master bedroom, and was therefore entitled to challenge the search. With respect to the search itself, the court found: (1) given the fact that shots were fired and there were children in the area, the officers had an "absolute duty to make sure that any weapons that may be about would be found"; (2) Carter invited the officers into the apartment; (3) the officers properly conducted a protective sweep to determine whether there were additional people in the apartment; (4) because the suspects were all on probation, the officers "[had] the right to search the apartment"; and (5) once Officer Bales found the ammunition in plain sight, he "clearly had the right to search then the entire presence for the purpose of other weapons. And he did so and further weapons were found." The court expressly found that there was no significance in the conflicting description of the suspects, Shekh's subsequent statement that he had not heard any gun shots, or the failure to make a more exhaustive attempt to locate Williams.

## DISCUSSION

Defendant argues that the court erred in denying his motion to suppress because: (1) Carter's consent to enter did not provide a basis for searching the entire apartment; (2) there were no exigent circumstances to justify the search that resulted in discovery of the firearms; (3) the suspects' probationary status did not justify the full search of the apartment; and (4) none of the four suspects had authority or control over the master bedroom. Appearing to contradict the last point, defendant asserts in his reply brief that the court properly found that as an overnight guest, defendant had a reasonable expectation of privacy that allowed him to challenge the search.

On appeal, we defer to the trial court's factual findings if they are supported by substantial evidence, but independently review as a question of law whether, on the facts found, the search conforms to the constitutional standard of reasonableness. (*People v. Alvarez* (1996) 14 Cal.4th 155, 182; *People v. Stewart* (2003) 113

Cal.App.4th 242, 248 (*Stewart*).) "We may sustain the trial court's decision without embracing its reasoning." ( *People v. McDonald* (2006) 137 Cal.App.4th 521, 529.) Accordingly, we will affirm the superior court's ruling on defendant's motion to suppress if it is correct on any theory of applicable law, "even if the ruling was made for an incorrect reason." ( Ibid.)

The first question is whether, as an overnight guest, defendant is entitled by law to challenge the search of apartment 128. "An illegal search or seizure violates the federal constitutional rights only of those who have a legitimate expectation of privacy in the invaded place or the seized thing. [Citations.] The legitimate expectation must exist in the particular area searched or thing seized in order to bring a Fourth Amendment challenge. [Citation.] Defendant bears the burden of showing a legitimate expectation of privacy. [Citation.]" ( *People v. Roybal* (1998) 19 Cal.4th 481, 507 (*Roybal*).) To establish a reasonable expectation of privacy, defendant must demonstrate that his subjective expectation is objectively reasonable, that is, "justifiable' under the circumstances." (*Smith v. Maryland* (1979) 442 U.S. 735, 740 [61 L.Ed.2d 220, 226-227].) Because the historical facts concerning standing are established by uncontradicted evidence, we independently review the trial court's ruling that defendant was entitled to challenge the search. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1172 (*McPeters*).)

In deciding whether a defendant has demonstrated a reasonable expectation of privacy, the court must consider whether: (1) the defendant has a property or possessory interest in the place searched; (2) whether he has the right to exclude others from that place; (3) whether he has shown the subjective expectation that the place would remain free from governmental invasion; (4) whether he took normal precautions to maintain his privacy; and (5) whether he was legitimately on the premises. (*Roybal*, *supra*, 19 Cal.4th at p. 507.) Whether an overnight guest has a reasonable expectation of privacy under this test turns on the facts of the particular case. (*See, e.g.*, *McPeters*, *supra*, 2 Cal.4th at pp. 1171-1172; see also *Stewart*, *supra*, 113 Cal.App.4th at pp. 250-253.)

Here, defendant's declaration in support of the suppression motion described his connection with the apartment in broad terms. From defendant's perspective, it was "his house" where he was "free to come and go" as he liked. Nothing in the declaration suggests that defendant's use of the apartment was limited to the common areas in the front. Indeed, Officer Bales testified that defendant and the two other men came from "the back hallway where the two bedrooms were" when he told them to come out. We conclude that the record supports the court's finding that defendant had a reasonable expectation of privacy in the entire apartment.

The second question is whether the search of the common areas of the apartment violated defendant's Fourth Amendment rights. Consent is a well-established exception to the warrant requirement. (*People v. Woods* (1999) 21 Cal.4th 668, 674.) A person on probation may validly consent in advance to warrantless searches and seizures in exchange for the chance to avoid serving a state prison term. ( Ibid.) The People have the burden of showing that the officers conducted the search pursuant to a valid exception to the warrant requirement. (*People v. Williams* (1999) 20 Cal.4th 119, 127-128, 136.)

The record supports the trial court's finding that Carter consented to the officer's entry into the apartment. At that point, Bales called for the suspects to come out, and then conducted a protective sweep to ensure the safety of the officers and nearby residents. (*See People v. Ledesma* (2003) 106 Cal.App.4th 857, 863.) Whether the officer has a reasonable suspicion to justify a protective sweep depends on the totality of the circumstances. ( Ibid.) Here the protective sweep was justified by the fact that recent shots had been heard in the vicinity, Shekh hailed the officers and directed them to apartment 128, a vehicle matching the dispatch description was parked nearby, children were playing in the area, there was a five minute delay before Carter opened the door of the apartment, and three additional men showed themselves only after the officers told them to come out with their hands up.

When the protective sweep revealed a bag of live ammunition in plain view, the officers conducted what Bales called a probation search based on the suspects' statement that they were on probation and did not live at the apartment. The officers found a .22-caliber handgun in the common area, and the additional weapons in the master bedroom.

Whether the probation search was justified turns on whether the officers understood that the suspects were subject to a search condition. (*See People v. Sanders* (2003) 31 Cal.4th 318, 332.) Although Bales's testimony that defendant was on "probation" may have been ambiguous, defendant conceded in his points and authorities in the trial court that it was "searchable probation." The court properly relied on that concession in ruling that the search was proper.

Slip Op. at 3-11.

In *Stone v. Wolff*, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

18

search or seizure was introduced at his trial." *Stone v. Wolff*, 428 U.S. 465, 494 (1976) (footnotes omitted).  Here, Petitioner was given a full and fair hearing at the trial court on his motion to suppress.  *See* Rep.'s Tr. at 85-130.  He was also permitted to appeal the trial court's ruling and the California Court of Appeal produced a reasoned decision upholding the trial court's determination not to suppress the evidence.  *See* Slip Op.  As such, Petitioner's Fourth Amendment claim is barred by *Stone*.  *See Moorman v. Schiro*, 426 F.3d 1044, 1053 (9th Cir. 2005) (*Stone* bars consideration of a Fourth Amendment claim in habeas when the state provided an evidentiary hearing at the trial level which was later reviewed by a state appellate court).

Furthermore, the remedy for a violation of the Fourth Amendment is exclusion of the illegally seized evidence at trial.  *See Warden v. Hayden*, 387 U.S. 294, 304-05 (1967); *Mapp v. Ohio*, 367 U.S. 643 (1961) (applying exclusionary rule to the states).  In the present case, Petitioner chose not to go to trial and pled guilty to the alleged crime.[8]  His plea was not a result of the denial of his motion to suppress and no evidence obtained in the search was used to convict Petitioner.  *See Broce*, 488 U.S. at 569 ("A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence.").  As such, even if Petitioner's Fourth Amendment rights were violated, as neither court to address the issue concluded, the constitutional infraction had no bearing upon Petitioner's conviction.  Petitioner is not entitled to habeas relief on Claim V.

## IV.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his Claims.  (*See* Pet'r's Traverse at p. 3.)  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see*

---

[8]     Fourth Amendment claims are also generally barred by the *Tollett* rule.  *Lefkowitz v. Newsome*, 420 U.S. 283, 289 (1975).  However, an exception exists where, as in California, a state permits defendants who plead guilty to still challenge the admissibility of the evidence as a violation of the Fourth Amendment on direct appeal.  *Id.* at 289-92.

1    *also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an

2    evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."

3    *Earp*, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is

4    "required to allege specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149

5    F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  In this case,

6    Petitioner's claims are readily determined by the record.  Petitioner has not alleged any additional

7    facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he

8    has a colorable claim for federal habeas relief.  Moreover, the Supreme Court has recently held

9    that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before

10   the state court that adjudicated the claim on the merits" and "that evidence introduced in federal

11   court has no bearing on" such review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398,

12   1400 (2011).  Thus, his request will be denied.

13                                          V.  CONCLUSION

14          Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary

15   hearing is DENIED.

16          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

17   writ of habeas corpus be DENIED.

18          These findings and recommendations are submitted to the United States District Judge

19   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

20   after being served with these findings and recommendations, any party may file written objections

21   with the court and serve a copy on all parties.  Such a document should be captioned "Objections

22   to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

23   served and filed within seven days after service of the objections.  The parties are advised that

24   failure to file objections within the specified time may waive the right to appeal the District

25   Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

26   Petitioner may address whether a certificate of appealability should issue in the event he elects to

file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

Cases (the district court must issue or deny a certificate of appealability when it enters a final

order adverse to the applicant).

DATED:  June 14, 2011

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE